# United States Court of Appeals

## For the First Circuit

No. 15-2408

MAINE MEDICAL CENTER ET AL.,

Plaintiffs, Appellees,

v.

SYLVIA M. BURWELL, SECRETARY,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant, Appellant.

No. 15-2483

MAINE MEDICAL CENTER ET AL.,

Plaintiffs, Appellants,

v.

SYLVIA M. BURWELL, SECRETARY,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]
[Hon. John H. Rich, III, U.S. Magistrate Judge]

Before

Howard, Chief Judge,
Selya and Kayatta, Circuit Judges.

　　　Stephanie R. Marcus, Attorney, Appellate Staff, Civil Division, United States Department of Justice, with whom Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Thomas E. Delahanty, II, United States Attorney, Andrew K. Lizotte, Assistant United States Attorney, and Mark B. Stern, Attorney, Appellate Staff, Civil Division, were on brief, for defendant.

　　　William H. Stiles, with whom Nora Lawrence Schmitt and Verrill Dana, LLP were on brief, for plaintiffs.

October 27, 2016

**SELYA**, **Circuit Judge**.  The system through which the federal government reimburses hospitals for charity care is among the most arcane known to man.  A central feature of this system is a provision through which hospitals receive so-called disproportionate share payments (DSH payments).  See 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).  These appeals involve a dispute between the Secretary of Health and Human Services (the Secretary) and a group of eight Maine hospitals[1] about DSH payments for fiscal years dating as far back as 1993.

After first clearing a jurisdictional hurdle, we hold that the Secretary properly reopened the disputed years and adequately demonstrated that the Hospitals had received substantial overpayments of DSH funds.  We further hold that the myriad defenses to repayment asserted by the Hospitals lack force.  Accordingly, we reverse in part and affirm in part.

## I.  BACKGROUND

Putting these appeals in perspective requires a journey into the "often surreal" Medicare reimbursement regime.  See S. Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 94 (1st Cir. 2002).  Medicare has a noble purpose: it assists elderly and disabled

---

[1] The eight hospitals (collectively, the Hospitals) are Maine Medical Center, Central Maine Medical Center, Mid Coast Hospital, Eastern Maine Medical Center, Mercy Hospital, Northern Maine Medical Center, Southern Maine Medical Center, and Maine General Medical Center.

- 3 -

individuals in accessing health care.  See 42 U.S.C. §§ 1395-1395*lll*.  This regime is administered by the Secretary through the Centers for Medicare and Medicaid Services (CMS), which contracts with fiscal intermediaries — often private health insurance companies — to act as go-betweens for Medicare providers and CMS.  See 42 C.F.R. § 421.100.[2]

Initially, the federal government reimbursed hospitals for the "reasonable cost" of treating Medicare patients.  See, e.g., R.I. Hosp. v. Leavitt, 548 F.3d 29, 39 (1st Cir. 2008).  In 1983, however, Congress amended the program to incorporate a prospective payment system through which hospitals are reimbursed predetermined amounts for certain services.  See 42 U.S.C. § 1395ww(d); R.I. Hosp., 548 F.3d at 39-40.  Congress was concerned, though, that the new payment system might disadvantage hospitals that served disproportionate numbers of low-income patients, so it created the DSH payment system to address this concern.  See 42 U.S.C. § 1395ww(d)(5)(F)(i)(I); H.R. Rep. No. 98-861, at 1356 (1984) (Conf. Rep.), as reprinted in 1984 U.S.C.C.A.N. 1445, 2044; S. Rep. No. 98-23, at 54 (1983), as reprinted in 1983 U.S.C.C.A.N. 143, 194.

---

[2] Unless otherwise indicated, we refer throughout to the version of the regulations in effect in 2003 (when the notices of reopening that undergird these appeals were issued).

The DSH payment protocol works this way. Hospitals that serve a "significantly disproportionate number of low-income patients" are known as disproportionate share hospitals (DSH hospitals). 42 U.S.C. § 1395ww(d)(5)(F)(i)(I); see Catholic Health Initiatives Iowa Corp. v. Sebelius, 718 F.3d 914, 916 (D.C. Cir. 2013). Those hospitals receive additional payments — known as DSH payments or DSH adjustments — from the government. See Catholic Health Initiatives, 718 F.3d at 916. Both a hospital's eligibility for DSH payments and the amount of any such payment depend in large part on the hospital's disproportionate patient percentage (DPP). See 42 U.S.C. § 1395ww(d)(5)(F)(vi). Generally speaking, the more low-income patients a hospital serves, the higher its DPP and, thus, the higher its annual DSH payment. See Catholic Health Initiatives, 718 F.3d at 916; Metro. Hosp. v. HHS, 712 F.3d 248, 251 (6th Cir. 2013). Nevertheless, this figure does not correlate directly with "the actual percentage of low-income patients served; rather, it is an indirect, proxy measure for low income." Catholic Health Initiatives, 718 F.3d at 916.

To receive Medicare payments (including DSH adjustments), a Medicare provider submits cost reports to an intermediary at the end of each fiscal year. The intermediary thereafter issues a notice of program reimbursement (NPR) specifying the amount the provider is owed in reimbursements and adjustments. See 42 C.F.R. §§ 405.1801(b)(1), 413.24(f), 421.100;

- 5 -

see also MaineGen. Med. Ctr. v. Shalala, 205 F.3d 493, 494, 496 (1st Cir. 2000). The intermediary may reopen a cost report within three years after issuing the NPR and, if necessary, issue a revised NPR. See 42 C.F.R. § 405.1885(a)-(b). A provider may appeal an intermediary's decision to the Provider Reimbursement Review Board (the Board). See 42 U.S.C. § 1395oo(a)(1)(A)(i). The Secretary has the option of reviewing Board decisions, and the agency's final decision is subject to judicial review. See id. § 1395oo(f)(1).

In the case at hand, the Secretary maintains that the Hospitals were overinclusive in their DSH payment calculations because they included patient days for patients entitled to both Medicare Part A and Medicaid but not supplemental security income (SSI), known as non-SSI type 6 days. The inclusion of these days dates back to at least 1997, when one of the plaintiffs (Central Maine Medical Center) settled an administrative cost report appeal. The settlement required the intermediary to include non-SSI type 6 days in its DSH payment calculations. Following this settlement and similar agreements between the intermediary and other hospitals in the late 1990s, the intermediary began telling all Maine hospitals to include such days in their cost reports.

In 2003, the intermediary changed its tune and reopened numerous cost reports to reassess DSH payments. After several meetings between the Hospitals, the intermediary, and CMS, CMS

remained unconvinced that non-SSI type 6 days should be included in the DSH payment calculation. Accordingly, the intermediary recouped from the Hospitals approximately $22 million in alleged overpayments.

The Hospitals did not go quietly into this bleak night: they challenged the intermediary's action before the Board. Their challenge bore fruit. The Board, finding many of the notices of reopening to be ineffectual, ordered the intermediary to restore approximately $17 million to the Hospitals.

The Hospitals' victory was short-lived. The Secretary elected to review the Board's decision and reversed. Displeased, the Hospitals sought judicial review. See 42 U.S.C. § 1395*oo*(f)(1). Following cross-motions for judgment on the administrative record, the district court[3] held that some notices of reopening were fatally flawed and that settlement agreements barred the intermediary from reopening certain cost reports. Neither side was completely satisfied with the district court's ruling, and these cross-appeals ensued.

## II. JURISDICTION

At the outset, a jurisdictional question looms. The parties jointly assure us that we have jurisdiction under 28 U.S.C.

_____

[3] For ease in exposition, we do not distinguish between the district judge and the magistrate judge but, rather, take an institutional view and refer throughout to the district court.

- 7 -

§ 1291, which permits us to review "appeals from all final decisions of the district courts." Notwithstanding their shared assurance, we have an independent obligation to confirm our jurisdiction to hear this dispute. See Anversa v. Partners Healthcare Sys., Inc., ___ F.3d ___, ___ n.5 (1st Cir. 2016) [No. 15-1897, slip op. at 15 n.5].

The district court's initial decision inspires some cause for concern: it directed the parties to inform the court which settlement agreements purported to be "full and final settlements of the issues raised concerning the cost reports for the years at issue." It went on to provide that if the parties disagreed about which settlement agreements satisfied this standard, the court would establish a dispute-resolution procedure. The parties could not agree on an answer to the question the court had posed. Instead, they jointly petitioned the court to amend its decision and leave the matter unresolved. The court acquiesced to the parties' suggestion that it did not need to answer the question "at this point" and simply removed the requirement from its decision.

A related matter also may bear on the jurisdictional issue. After the district court handed down its initial decision, the Hospitals requested the payment of interest on the amounts due under the court's decision. The court denied the Hospitals'

request without prejudice because the precise amounts owed to the Hospitals had not yet been determined.

We begin the probe into our subject-matter jurisdiction with first principles. As a general matter, a final decision is one "that disposes of all claims against all parties." Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 6 (1st Cir. 2013). The decision in this case does not satisfy that general rule; it leaves open the identification of the fiscal years to which the decision applies, as well as the question of interest.

Here, however, the general rule does not apply because this is not an appeal from a garden-variety civil judgment. Rather, it is an appeal taken from the district court's review of agency action.

This is a critically important distinction because "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." County of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting PPG Indus., Inc. v. United States, 52 F.3d 363, 365 (D.C. Cir. 1995)); see Hosp. Ass'n of R.I. v. Sec'y of HHS, 820 F.2d 533, 538 (1st Cir. 1987) (stating that "it is the Secretary who must first apply" the applicable law to the facts). Thus, the court below had gone as far as it could go: even if it had intended to resolve other issues at a later

date, it lacked any authority to do so.[4]  Consistent with the limits of the district court's authority, we construe its decision as a remand to the agency.  See County of Los Angeles, 192 F.3d at 1012.

Even so, a remand order is not usually considered a final decision.  See Glob. NAPs, Inc. v. Mass. Dep't of Telecomms. & Energy, 427 F.3d 34, 41 (1st Cir. 2005).  There is an exception, though, for cases "where the agency to which the case is remanded seeks to appeal and it would have no opportunity to appeal after the proceedings on remand."  County of Los Angeles, 192 F.3d at 1012 (quoting Occidental Petrol. Corp. v. SEC, 873 F.2d 325, 330 (D.C. Cir. 1989)).  This is such a case: the Secretary will have to conduct further proceedings pursuant to the remand order and, unless the Hospitals appeal the outcome of those further proceedings, the district court's ruling will escape review.  See id.

To be sure, a district court's failure to award or withhold interest may in some circumstances prevent its decision

---

[4] In all events, the administrative record does not contain all of the documentation needed to permit a determination as to which settlement agreements were full and final settlements of the issues raised concerning the cost reports for the years at issue. Ideally, the agency — not the district court — should be the body to augment the record.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam) (explaining that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

on the merits from being a final judgment.  See Comm'l Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 37 & n.3 (1st Cir. 2000).  But in this case, the district court's refusal to pass upon the Hospitals' request for interest does not alter our analysis.  Since the district court had to remand to the agency to determine the precise amounts due to the Hospitals, an award of interest would have been premature.  See Palisades Gen. Hosp. Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (holding that district court lacked authority to order specific relief because it had jurisdiction only to vacate agency's decision, and then had to remand).

We conclude that we have jurisdiction to hear and determine these appeals.  Consequently, we proceed to the merits.

**III.  STANDARDS OF REVIEW**

We review the judgment of the district court de novo. See Doe v. Leavitt, 552 F.3d 75, 78 (1st Cir. 2009).  Given the nature of the case, we — like the court below — are obliged to apply familiar principles of administrative law.  See Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

The most basic of these tenets is that a court will disturb an agency's decision only if that decision is "arbitrary, capricious, an abuse of discretion," "otherwise not in accordance with law," or "unsupported by substantial evidence in the administrative record."  S. Shore Hosp., 308 F.3d at 97 (citations

- 11 -

omitted). Atop this tenet lies a "further gloss." Id. When Congress has spoken directly on a particular issue and the traditional tools of statutory interpretation reveal that congressional intent is clear, an inquiring court must give effect to Congress's intent. See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 & n.9 (1984). If Congress did not directly address the issue, the question reduces to whether the agency's view is based on a permissible construction of the statute. See id. at 843. Particular deference is owed to the agency's interpretation of its own regulations when Congress has entrusted the agency with rulemaking authority. See S. Shore Hosp., 308 F.3d at 97. That deference is most pronounced when the issue involves "a complex and highly technical regulatory program," such as Medicare, "in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." Id. (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).

## IV. THE SECRETARY'S APPEAL

The Secretary claims that the district court erred both by holding certain notices of reopening invalid and by holding that settlement agreements barred the reopening of certain cost reports. We put these claims in context and then explain why we accept them.

- 12 -

## A.  Validity of Notices of Reopening.

We start with the validity of the notices of reopening.[5] To initiate a cost report reopening, the intermediary must give a hospital written notice.  See 42 C.F.R. § 405.1887(a).  At that point, the hospital "shall be allowed a reasonable period of time in which to present any additional evidence or argument in support of [its] position."  Id. § 405.1887(b).  In this instance, the district court ruled that certain notices of reopening were invalid because they failed to comply with the Medicare Provider Reimbursement Manual, CMS Pub. 15-1, Section 2932 (PRM).  This ruling illuminates a lack of congruence between the regulations and the PRM.  On the one hand, the regulations simply require "written notice" to all parties and allowance of "a reasonable period of time in which to present any additional evidence or argument in support of [the party's] position."  42 C.F.R. § 405.1887(a)-(b).  On the other hand, the PRM goes further: it requires that the notice advise the provider "as to the circumstances surrounding the reopening, i.e., why it was necessary to take such action, and [notify the provider of its] opportunity to comment, object, or submit evidence in rebuttal."  PRM § 2932(A).

---

[5] We limit our discussion under this heading to the district court's rationale for invalidity.  The Hospitals' other arguments for invalidity, rejected by the district court, are discussed infra in connection with our discussion of the Hospitals' appeal.

Here, the written notices sent by the intermediary were terse. They stated:

> The above referenced Medicare cost report is reopened to address the following issue:
>> To review and correct the disproportionate share hospital (DSH) payment calculation in accordance with section 1886(d)(5)(F) [of] the Social Security Act and 42 CFR 412.106.
>
> Please contact me at . . . if you have any questions regarding this reopening.

The Hospitals do not seriously argue that the notices failed to satisfy the plain language of the regulation. They do argue, however — and the district court found — that the notices did not satisfy the more elaborate criteria limned in the PRM: although the notices advised the Hospitals of the circumstances surrounding the reopening by identifying DSH payments as the relevant issue, they failed to furnish any additional detail and did not offer the Hospitals the opportunity to comment, object, or submit evidence in rebuttal.

Essentially, the Secretary makes two arguments. First, she says that the notices substantially complied with the demands of the PRM. Second, she says that even if they did not, they complied with the regulation — and no more was exigible.

The second of these arguments is dispositive. The regulation itself does not require that a notice of reopening include advice about the opportunity to present evidence and arguments. The regulation controls: as we said in an earlier case

- 14 -

discussing the PRM, the PRM is nothing more than an interpretive guide and, as such, "interpretive guides generally do not have the force of law."[6]  S. Shore Hosp., 308 F.3d at 103; accord Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995) (concluding that the PRM does not have the force and effect of law).

## B.  Effect of Settlement Agreements.

This brings us to the Secretary's contention that the settlement agreements present no barrier to the cost report reopenings in this case.  This contention rests on solid ground: the regulations make pellucid that an intermediary lacks the authority to make payments that are not authorized by Medicare. See 42 C.F.R. § 421.100(a)(1)(ii) (directing intermediary to ensure "that it makes payments only for services that are . . . [c]overed under Medicare").  We see no reason why an intermediary would have any greater authority when entering into

---

[6] Because we agree with the Secretary that the PRM did not bind her, we need not decide whether she substantially complied with its notice requirements.  We note, though, that the Hospitals do not appear to have suffered any prejudice because the notices failed to comport fully with the PRM's guidance.  The Hospitals' representatives attended numerous meetings to discuss the DSH adjustments and took full advantage of ample opportunities to present their side of the story.  This alone suggests that the Secretary may well have substantially complied with the notice provisions of the PRM. See, e.g., Boateng v. InterAm. Univ., Inc., 210 F.3d 56, 61 (1st Cir. 2000) (finding substantial compliance where error was harmless); In re Hollingsworth & Whitney Co., 242 F. 753, 760-61 (1st Cir. 1917) (finding substantial compliance where parties were not denied the opportunity to present the merits of their case in any material respect).

a settlement agreement or administrative resolution.[7]  The fact that the Secretary was not a party to the settlement agreements reinforces this conclusion.  See Howard Young Med. Ctr., Inc. v. Shalala, 207 F.3d 437, 443 (7th Cir. 2000) (holding Secretary not bound by stipulation entered into by intermediary); Appalachian Reg'l Healthcare, Inc. v. Shalala, 131 F.3d 1050, 1053 n.4 (D.C. Cir. 1997) (holding Secretary not bound by intermediary's statements before the Board).

We acknowledge that the intermediary represented to at least one hospital (Central Maine Medical Center) that it had the authority to enter into a settlement that included non-SSI type 6 days.  Such a representation, however, cannot cloak the intermediary with authority that it does not have.  Cf. Sheinkopf v. Stone, 927 F.2d 1259, 1269 (1st Cir. 1991) (recognizing that, under doctrine of apparent authority, agent's own words are insufficient to bind principal).  The Supreme Court has made it

_____

[7] Before the agency, the Hospitals advanced a more nuanced argument: that the settlement agreements barred the intermediary from reopening the cost reports under its permissive reopening authority, meaning that CMS had to follow the mandatory reopening protocols if it did not want to comply with the agreements.  See 42 C.F.R. § 405.1885(a)-(b).  This nuanced argument was mentioned only briefly in the district court and evaporated entirely on appeal.  Consequently, we treat it as waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  For the sake of completeness, though, we note that the settlement agreements do not seem to bar the intermediary from reopening under its permissive authority; they appear only to require the intermediary to issue revised NPRs, without discussion of whether the revised NPRs could be reopened.

- 16 -

nose-on-the-face plain that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); see United States v. Flemmi, 225 F.3d 78, 85 (1st Cir. 2000) (noting that "doctrines such as estoppel and apparent authority are not available to bind the federal sovereign"). Here, the Hospitals accepted public funds knowing (or, at least, being fully charged with knowledge of) the limitations of intermediaries; and any attempt by the Hospitals to claim that they reasonably relied on the intermediary's extra-legal representations would be empty.[8] See Heckler v. Cmty. Health Servs., 467 U.S. 51, 64-65 (1984); Faith Hosp. Ass'n v. Blue Cross Hosp. Serv., 537 F.2d 294, 295 (8th Cir. 1976) (per curiam); see also Madison Gen. Hosp., Inc. v. United States, No. 141-85 C, 1986 WL 66215, at *2-3 (Cl. Ct. Sept. 19, 1986) (holding that a settlement agreement between a hospital and an intermediary did not bind the government when the intermediary lacked authority to settle the claim).

---

[8] Knowing the circumscribed authority of intermediaries, the utter lack of any documentation concerning the intermediary's purported authority to include previously excluded days in DSH computations should have constituted a flashing red light, easily visible to the Hospitals.

- 17 -

This ends our analysis of the Secretary's appeal.  The short of it is that we find her arguments largely persuasive.  We therefore proceed to the Hospitals' appeal.  As we undertake that task, we are cognizant that unless the Hospitals prevail, the Secretary will be entitled to the relief that she seeks.

## V.  THE HOSPITALS' APPEAL

In their appeal, the Hospitals advance three main lines of argument.  They begin with the proposition that the reopening notices were invalid because they failed to comply with mandatory reopening provisions contained in the regulations.  As a fallback, the Hospitals say that even if the notices of reopening were valid, non-SSI type 6 days were properly included in DSH calculations.  Finally, the Hospitals suggest that they should either be held harmless or absolved as without fault for including non-SSI type 6 days in their DSH calculations.  We examine each line of argument in turn.

### A.  Effect of Mandatory Reopening Provisions.

The Hospitals assert that the notices of reopening were invalid for a reason different from those identified by the district court.  Their view has morphed over time, see supra note 7; but as expressed here, their assertion seems to be that the mandatory reopening provisions of 42 C.F.R. § 405.1885(b) must always be complied with, and those provisions were flouted because there was no documentation of CMS's instruction to the intermediary

- 18 -

to reopen the cost reports.  The Secretary demurs, asserting that compliance with the mandatory reopening provisions does not constitute the exclusive method for reopening and that, under the circumstances of this case, the intermediary was at liberty to reopen the cost reports without a written directive from CMS.  The district court agreed with the Secretary's conclusion, and so do we.

It is clear that the regulations allow an intermediary to reopen its own determination.  See 42 C.F.R. § 405.1885(a) (explaining that "[a] determination of an intermediary . . . may be reopened . . . by such intermediary . . . either on motion of such intermediary . . . or on the motion of the provider").  The regulations also make clear that CMS (acting for the Secretary) has the authority to direct an intermediary to reopen a determination.  See id. § 405.1885(b)(1) ("An intermediary determination . . . must be reopened and revised by the intermediary if . . . CMS— (i) Provides notice to the intermediary that the intermediary determination . . . is inconsistent with the applicable law . . . ; and (ii) Explicitly directs the intermediary to reopen and revise . . . .").

Here, the record indicates that CMS instructed the intermediary to reopen the cost reports, but did not issue a written directive to that effect.  Rather, the instruction appears to have taken place orally and informally.  The Hospitals' argument

is that, under 42 C.F.R. § 405.1885(b)(1), a written directive from CMS was a condition precedent to reopening. We find this wooden reading of the regulation insupportable: it would nullify an intermediary's power to reopen if CMS advises it to reopen only in a casual conversation, and that dilution of the intermediary's power would serve no useful purpose. Indeed, it would pay obeisance to formalism for formalism's sake.

The more logical reading of the regulation is that it simply makes clear the power structure in play: CMS trumps the intermediary. Should an intermediary and CMS disagree about the need for reopening, CMS may force the intermediary's hand. Such a situation did not occur here because the intermediary reopened the cost reports as CMS desired. Accordingly, any failure to comply with the mandatory reopening provisions did not abrogate the notices of reopening.

## B.  Treatment of Non-SSI Type 6 Days.

We turn next to the Hospitals' contention that the statutory scheme permits providers to include in DSH calculations all patients eligible for either Medicare or Medicaid, whether or not those patients are entitled to SSI. Like the agency and the district court, we reject this contention.

The DPP is the sum of two fractions: the Medicare fraction and the Medicaid fraction.[9]  See 42 U.S.C. § 1395ww(d)(5)(F)(vi); Catholic Health Initiatives, 718 F.3d at 916.  For the Medicare fraction, the numerator is the number of patient days for patients who were entitled to both Medicare Part A and SSI benefits.  See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I); see also Metro. Hosp., 712 F.3d at 251; 42 C.F.R. § 412.106(b)(2). The denominator is the number of patient days for patients entitled

_____

[9] The statute provides in pertinent part:

the term "disproportionate patient percentage" means, with respect to a cost reporting period of a hospital, the sum of--

(I) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter, and

(II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi) (emphasis added).

to Part A benefits. See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). For the Medicaid fraction, the numerator is the number of patient days for patients who were eligible for coverage under a federally approved state Medicaid plan but who were ineligible for Medicare Part A coverage. See id. § 1395ww(d)(5)(F)(vi)(II); see also Metro. Hosp., 712 F.3d at 251; 42 C.F.R. § 412.106(b)(4). The denominator is the total number of patient days. See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

This taxonomy, as the Secretary interprets it, excludes patients who are entitled to both Medicare Part A and Medicaid, but not entitled to SSI. The Secretary reasons that a patient must be eligible for SSI to be included in the Medicare fraction numerator and must be ineligible for Medicare Part A to be included in the Medicaid fraction numerator. The Hospitals take issue with this reasoning, insisting that all Medicaid- and Medicare-eligible patient days, including non-SSI type 6 days, should be included in the DSH calculation.

Our resolution of these dueling interpretations is guided by the Supreme Court's landmark decision in Chevron. Where applicable, Chevron requires a two-step approach. See 467 U.S. at 842-43. At step one, an inquiring court must determine whether Congress has spoken clearly and, if so, must give effect to Congress's intent. See id. Step two is necessary only if Congress's intent is unclear: in that event, the question reduces

to whether the agency's view is based on a permissible interpretation of the statute.  See id. at 843.

Here, we need not go beyond step one.  The language of the controlling statute is unambiguous, and the Secretary's interpretation of the statute faithfully tracks its plain language.

The Hospitals nonetheless point out that in a Chevron step one analysis, courts must apply the traditional rules of statutory interpretation.  See id. at 843 & n.9.  These rules include the canon that statutes should be construed to avoid absurd results.  See Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009).  Seizing on this canon, the Hospitals argue that excluding certain low-income patients from the DSH calculation is absurd because the purpose of the figure is to compensate hospitals for providing services to disproportionately large populations of low-income patients.

Although the kind of line-drawing that is often necessary in our administrative state may occasionally be unsatisfying at the edges, that discomfiture does not make a rule absurd.  See, e.g., Sprandel v. Sec'y of HHS, 838 F.2d 23, 27 (1st Cir. 1988) (per curiam).  Absurdity, like beauty, sometimes lies in the eye of the beholder.  So it is here: given that the DSH calculation is merely a proxy for low-income patients rather than a reimbursement scheme designed to compensate hospitals for care

administered to specific patients, see Catholic Health Initiatives, 718 F.3d at 916, we do not consider the exclusion of certain low-income patients to be absurd. While the rules for Medicare reimbursement may seem inscrutable at times, Congress's intent with regard to this provision is transparently clear. Thus, the Secretary's reading of the provision is unimpugnable and our analysis can stop at Chevron step one. See 467 U.S. at 842 (stating that "[i]f the intent of Congress is clear, that is the end of the matter").

Even if a Chevron step two analysis were required, the result would be the same: it is crystal clear that the Secretary's interpretation would certainly be permissible under Chevron step two. The Hospitals' argument rests upon the supposition that Congress must have intended to include in the DSH calculation all patients eligible for either Medicare or Medicaid. But the authorities on which they rely for that supposition, see Jewish Hosp., Inc. v. Sec'y of HHS, 19 F.3d 270 (6th Cir. 1994); Edgewater Med. Ctr. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield of Ill., 2000 WL 1146601 (HCFA Admin. June 19, 2000), lend no support.

To be sure, the Jewish Hospital court stated that "Congress intended to include all days attributable to Medicaid beneficiaries in the proxy." 19 F.3d at 276. The context of the case reveals, however, that the Sixth Circuit's analysis was

focused on the meaning of the words "eligible for" medical assistance and "entitled to" benefits, 42 U.S.C. § 1395ww(d)(5)(F), without reference to SSI status. See Jewish Hosp., 19 F.3d at 274-76; see also Metro. Hosp., 712 F.3d at 259 (limiting decision in Jewish Hosp.).

So, too, the Secretary's decision in Edgewater explains that one apparent purpose of the two fractions that compose the DPP is to prevent double counting of patient days. See 2000 WL 1146601, at *5 n.17. Again, the Secretary was considering the "eligible for" versus "entitled to" dichotomy addressed in Jewish Hospital. See id. at *4-5. The decision simply did not consider the possibility that a patient could be eligible for Medicare and Medicaid but ineligible for SSI. See id. at *4. And to the extent the decision is applicable at all, it is more helpful to the Secretary than to the Hospitals: it recognizes that the plain language of the statute excludes from the Medicaid fraction individuals who are eligible for Medicare Part A. See id. (noting that "the statutory phrase in the Medicaid proxy 'but who were not entitled to benefits under Medicare Part A of this title' forecloses the inclusion of the days at issue in this case in the numerator of the Medicaid proxy" (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II))).

The Hospitals argue that these two decisions require us to hold that an interpretation of the statutory provision that

does not count a particular low-income patient at all must be an unreasonable synthesis of congressional intent. But — as we have shown — the authorities upon which the Hospitals rely do not support, let alone require, such a view, and we refuse to take such a gargantuan leap. We believe that the Secretary, at the very least, acted permissibly in adhering to the plain language of the statute, which is typically the best evidence of Congress's intent. See Metro. Hosp., 712 F.3d at 269 (stating that the "exclusion of at least some dual-eligible patient days . . . appears to be inevitable based on" the statute's structure).

## C. Confession and Avoidance.

In a last-ditch effort to stem the tide, the Hospitals attempt to confess and avoid. This attempt takes two forms.

First, the Hospitals claim that, even if their DSH calculations were incorrect, they should be held harmless from any obligation to refund overpayments. This claim rests on a program memorandum issued by the Secretary, see Program Memorandum HCFA-Pub. 60A, No. A-99-62 (Dec. 1, 1999) (PM A-99-62), which instructed intermediaries to refrain from recouping "the portion of Medicare DSH adjustment payments previously made to hospitals attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days in the Medicaid days factor used in the Medicare DSH formula." The Secretary argued below —

and the district court found — that this hold-harmless provision does not extend to the obligation to refund DSH overpayments based on non-SSI type 6 days.  We agree.

Read in context, PM A-99-62 plainly concerns a different DSH calculation issue.  Historically, "hospitals and Intermediaries [had] relied, for the most part, on Medicaid days data obtained from State Medicaid agencies to compute Medicare DSH payments and . . . some of those agencies commingled the types of otherwise ineligible days . . . with Medicaid Title XIX days."  PM A-99-62.  Seen in this light, the hold-harmless provision in PM A-99-62 must refer to the calculation of Medicaid-eligible patient days, not to whether Medicaid- and Medicare-eligible patients who were not entitled to SSI could be included in the DSH calculation.

Nor can there be any legitimate doubt about the sweep of the hold-harmless provision.  PM A-99-62 itself states that it "is not intended to hold hospitals harmless for any other aspect of the calculation of Medicare DSH payments or any other Medicare payments."

In yet another effort to confess and avoid, the Hospitals attempt to skirt liability by insisting that they should be excused as being "without fault" for collecting DSH overpayments because they reasonably relied on the incorrect advice of their intermediary.  See 42 U.S.C. § 1395gg.  The Secretary rejoins that the statute on which the Hospitals rely, 42 U.S.C. § 1395gg, does

not apply to DSH overpayments because they are aggregate payments as opposed to reimbursement for services provided on behalf of a specific patient. We agree with the district court that the Secretary's argument carries the day.

Section 1395gg sets forth a framework for recovering overpayments made to or on behalf of individuals. As part of this scheme, Section 1395gg(b) authorizes the Secretary to recoup overpayments from individuals and providers when the overpayments were made "for items or services furnished an individual." Section 1395gg(c) carves out an exception: it provides that overpayments made "with respect to an individual who is without fault" should not be recouped if doing so "would defeat the purposes of [Social Security] or [Medicare] or would be against equity and good conscience." Congress's repeated references to "individuals" in the text of the statute convince us that the "without fault" language in Section 1395gg(c) does not apply to DSH payments, the calculation of which does involve individual patient days but only as a means of evaluating a provider's patient population income level. See Visiting Nurses Ass'n of Sw. Ind., Inc. v. Shalala, 213 F.3d 352, 357 (7th Cir. 2000) ("Because the only adjustment contemplated by § 1395gg(b) is an adjustment of payments to individuals, no waiver under § 1395gg(c) is possible for these providers."); see also Medicare Program; "Without Fault" and Waiver of Recovery from an Individual as it Applies to Medicare

- 28 -

Overpayment Liability, 63 Fed. Reg. 14,506, 14,510 (Mar. 25, 1998) ("[T]he without fault provisions under [42 U.S.C. § 1395gg] do not extend to aggregate overpayment issues, such as Medicare cost report errors, because liability for an individual claim cannot be shifted to a specific individual.").

The Hospitals make one final argument. They protest that during meetings at which the Hospitals, CMS, and the intermediary were all represented, the attendees discussed whether the Hospitals satisfied the "without fault" requirements and agreed that the provision applied. But even if this is an accurate depiction of the parties' negotiations, it does not preclude the Secretary from asserting a different view now. In the absence of detrimental reliance — and we see none here — the Secretary is not foreclosed from changing a position that she has come to conclude is rooted in a mistaken interpretation of the statutory scheme. See Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993).

## VI. CONCLUSION

We need go no further. For the reasons elucidated above, we reverse the judgment of the district court as to the cost reports for which the Board and the district court found that the notices provided to specific plaintiffs were inadequate and as to the cost reports for providers and years covered by written settlement agreements entered into by individual providers and the intermediary. As to all other plaintiffs and cost years, we affirm

the district court's entry of judgment for the Secretary.  All parties shall bear their own costs.

**<u>Reversed in part, affirmed in part, and remanded with instructions to enter judgment in favor of the Secretary</u>.**