# United States Court of Appeals

## For the First Circuit

_____

No. 19-1475

ASOCIACIÓN HOSPITAL DEL MAESTRO, INC.; HOSPITAL ALEJANDRO
OTERO LOPEZ, a/k/a Manati Medical Center Dr. Otero Lopez;
HOSPITAL BELLA VISTA; HOSPITAL BUEN SAMARITANO, a/k/a
Hospital Comunitario Buen Samaritano; HOSPITAL DAMAS;
HOSPITAL DE LA CONCEPCIÓN; HOSPITAL DOCTOR'S CENTER;
HOSPITAL DR. CAYETANO COLL Y TOSTE; HOSPITAL DR. PEREA;
HOSPITAL EPISCOPAL CRISTO REDENTOR; HOSPITAL EPISCOPAL
SAN LUCAS I; HOSPITAL EPISCOPAL SAN LUCAS II; HOSPITAL
GENERAL MENONITA (AIBONITO); HOSPITAL GENERAL MENONITA
(CAYEY); HOSPITAL METROPOLITANO DR. TITO MATTEI, a/k/a
Hospital Pavia Yauco; HOSPITAL DR. SUSONI; HOSPITAL
METROPOLITANO RIO PIEDRAS; HOSPITAL PAVIA HATO REY;
HOSPITAL PAVIA SANTURCE; HOSPITAL RYDER MEMORIAL;
HOSPITAL SAN CARLOS BORROMEO; HOSPITAL SAN FRANCISCO;
HOSPITAL SAN PABLO; HOSPITAL SAN PABLO DEL ESTE; HOSPITAL
WILMA N. VAZQUEZ, a/k/a Centro Medico Wilma N. Vazquez,

Plaintiffs, Appellants,

v.

XAVIER BECERRA, in his official capacity as Secretary of the
United States Department of Health and Human Services[*]

Defendant, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colon, U.S. District Judge]

_____

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Secretary of the U.S.
Department of Health and Human Services Xavier Becerra has been
substituted for former Secretary of the U.S. Department of Health
and Human Services Alex M. Azar as appellee.

Before

Howard, <u>Chief Judge</u>,
Barron, <u>Circuit Judge</u>,
and McAuliffe, <u>District Judge</u>.**

_____

    <u>Robert L. Roth</u>, with whom <u>Hooper, Lundy & Bookman, P.C.</u> was on brief, for appellants.
    <u>Courtney L. Dixon</u>, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom <u>Joseph H. Hunt</u>, Assistant Attorney General, and <u>Mark B. Stern</u>, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellee.

_____

August 18, 2021

_____

---

** Of the District of New Hampshire, sitting by designation.

**McAULIFFE**, **District Judge**.  American hospitals provide critical medical care to many people who are uninsured, underinsured, and otherwise unable to pay.  Recognizing the financial burden borne by those hospitals, Congress has developed programs that aim to mitigate it.  This appeal presents issues related to the implementation of one such program.

Hospitals that provide unreimbursed care to a disproportionate number of low-income patients are eligible, under the Medicare Program, to receive money from the government to partially offset the costs of providing that care.  Those government payments are known as "disproportionate share hospital payments" or "DSH Payments."  The amounts paid are calculated by applying a multi-factor formula established by Congress.

When the DSH reimbursement program was enacted, it covered only hospitals in the fifty states.  But shortly thereafter, in 1986, Congress included hospitals in Puerto Rico.  In doing so, Congress provided that the existing statutory formula used to calculate DSH payments would apply to Puerto Rico hospitals "in the same manner and to the extent" it applies to hospitals in the states.  But a problem arose, highlighted by this case: when the statutorily prescribed reimbursement formula was applied to hospitals in Puerto Rico, the resulting DSH payments were often substantially less than the DSH payments provided to similarly-situated hospitals in the states.

That disparity occurred because, as a "proxy" for the number of low-income patients actually treated by a hospital, the statutory formula counted the number of patients who were receiving both Medicare and Supplemental Security Income ("SSI") benefits from the Social Security Administration. But, Puerto Rico residents, while citizens of the United States, are not eligible for SSI benefits. Consequently, part of the formula's proxy – patients receiving SSI benefits – not only failed to accurately measure the number of low-income patients who received care in Puerto Rico hospitals, but it also frequently diminished the support hospitals in Puerto Rico received compared to similarly-situated hospitals in every state.

Appellants are a group of 25 acute-care hospitals in Puerto Rico that received DSH payments from the government. They challenge the DSH payments they received from 1999 through 2006, arguing that they should have received sums roughly equivalent to those received by their stateside counterparts. Specifically, they allege that the Secretary of the United States Department of Health and Human Services improperly calculated their DSH payments by failing to use a different proxy – one that did not include receipt of SSI benefits - when approximating how many low-income patients appellants had treated during the relevant period.

Before the district court, appellants challenged the Secretary's interpretation and application of the statutory

formula (as well as the agency's implementing regulations), arguing that they were inconsistent with the Medicare Act, the Administrative Procedure Act ("APA"), and the Equal Protection Clause of the United States Constitution. The district court addressed each of those arguments, but in the end denied relief.

While we recognize an apparent (and perhaps unintended) unfairness in this situation, we, like the district court, necessarily conclude that the Secretary did not err in implementing the statute. We also agree with the district court that the appellant hospitals have not shown that they were the victims of any unlawful or unconstitutional discrimination by the Secretary. Accordingly, we affirm the district court's decision granting the Secretary's motion for summary judgment and denying appellants' motion for summary judgment.

## I.

The material facts are not in dispute. In April of 1986, Congress amended the Medicare Inpatient Prospective Payment System ("IPPS") to provide that hospitals serving "a significantly disproportionate number of low-income patients" may receive a "disproportionate share adjustment" payment. See 42 U.S.C. § 1395ww(d)(5)(F)(i) & (ii). DSH payments are based upon a participating hospital's "disproportionate patient percentage" ("DPP"). Id. § 1395ww(d)(5)(F)(v) & (vi). The DPP is the sum of two fractions designed to capture the approximate percentage of

low-income patients the hospital serves, on an inpatient basis, in a given fiscal year. Only the first fraction, known as the "Medicare/SSI fraction," is at issue here. It is defined as follows:

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under [Medicare Part A] and were entitled to supplementary security income [SSI] benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under [Medicare Part A].

Id. § 1395ww(d)(5)(F)(vi)(I) (emphasis supplied).

As originally enacted, the program applied only to hospitals in the fifty states and the District of Columbia. Hospitals in the territories, including the Commonwealth of Puerto Rico, were (and continued to be) reimbursed under an older system, based upon "reasonable costs" incurred in providing inpatient services to Medicare patients. Congress, however, directed the Secretary to consider whether the territories should be included in the new program and, in 1986, the Secretary submitted a detailed report summarizing his findings.

With regard to Puerto Rico, the Secretary concluded that the new payment system "appears to be compatible with the Puerto Rico hospital system." Otis R. Bowen, U.S. Dep't of Health and

Hum. Servs., Report to Congress on Recommendations for Extending Hospital Prospective Payment to Participating Hospitals Outside the 50 States and the District of Columbia, at 1 (1986). The Secretary's report noted, however, that even after adjusting for lower wages, hospitals in Puerto Rico had "significantly lower" healthcare costs than hospitals in the states – that is, hospitals in Puerto Rico were not, strictly speaking, similarly situated to those in the states. Id. at 2 (observing that hospitals in Puerto Rico had been more successful in containing healthcare costs "through more efficient use of hospital resources"; that the "standardized cost per case in Puerto Rico is significantly lower"; and some evidence suggested that "hospital costs per admission in Puerto Rico have not been increasing at the same rate as hospital costs in the [states]"). The Secretary suggested that "the fact that the [reimbursement system] would be suitable for implementation in Puerto Rico does not mean that these hospitals should be paid at the same level as hospitals already in the prospective payment system. Costs in Puerto Rico hospitals are not comparable in absolute terms to costs in U.S. hospitals." Id. at 29. Accordingly, the Secretary recommended that Congress establish a reimbursement rate for Puerto Rico "based on a blend of 25 percent national Federal standardized rate and 75 percent standardized rate for Puerto Rico." Id. at 4.

No doubt relying on the Secretary's Report, Congress, in 1986, enacted the Omnibus Budget Reconciliation Act of 1986, PL 99-509, § 9304 (codified as amended at 42 U.S.C. § 1395ww(d)(9)(D)) (the "Puerto Rico IPPS Statute"). That statute provides that the "<u>provisions</u>" of the Medicare statute relating to disproportionate share payments "<u>shall apply</u>" to Puerto Rico hospitals in the "<u>same manner and to the extent as they apply</u>" to hospitals in the states. 42 U.S.C. § 1395ww(d)(9)(D) (emphases supplied). The parties dispute the proper interpretation of the highlighted language.

The Secretary asserts that the language of the Puerto Rico IPPS Statute is unambiguous and means precisely what it says: to calculate the DSH payments to a Puerto Rico hospital, the Secretary must apply the "provisions" of the statutory formula set out in 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) "in the same manner and to the extent" those provisions are applied to hospitals in the states. As noted above, that formula counts the number of inpatients who were receiving SSI benefits – a federal program for which residents of Puerto Rico are not eligible.[1]

---

[1] The United States Supreme Court recently granted certiorari to consider whether Congress violated the Fifth Amendment's Equal Protection Clause by establishing Supplemental Security Income in the fifty states, the District of Columbia, and the Northern Mariana Islands, but not extending that program to residents of Puerto Rico. <u>United States</u> v. <u>Vaello-Madero</u>, 956 F.3d 12 (1st Cir. 2020), <u>cert. granted</u>, __ U.S. __, __ S.Ct. __, __ L.Ed.2d __, 2021 WL 769690 (Mar. 1, 2021) (No. 20-303). In this case, appellants do not assert a similar challenge to the statutory formula's application to Puerto Rico hospitals, nor do

- 8 -

Appellants also think the statute is unambiguous, but urge a different construction. First, they point out that Congress's purpose in providing DSH payments to hospitals in Puerto Rico was to compensate them for higher costs associated with treating low-income patients. Next, they say the Secretary has undermined that purpose by employing receipt of SSI benefits as a proxy for quantifying low-income patients treated by hospitals in Puerto Rico: "the Secretary's implementation of the Puerto Rico IPPS Statute unreasonably transforms a statute that was specifically intended to provide DSH payments to Puerto Rico hospitals into a statute that severely limits, and in some cases totally eliminates, such payments." Appellants' Brief at 4. Appellants claim that by parroting the statutory language in the implementing regulations, the Secretary has continued, rather than remedied, the problem (this assertion forms the basis for appellants' APA claim). In short, appellants argue that, when calculating DSH payments for Puerto Rico hospitals, not only was the Secretary empowered to use a proxy other than receipt of SSI benefits, he was obligated to do so.[2]

they argue for a stay pending resolution of Vaello-Madero. Here, appellants vigorously, and singularly, challenge the Secretary's administrative implementation of the statutory formula's "Medicare/SSI fraction."

    [2]   Parenthetically, we note that in 1974, the scope of Title XVI of the Social Security Act was expanded to provide SSI benefits to residents of the states – benefits that extended beyond Title XVI's earlier cash assistance programs for the needy, aged, blind,

Finally, appellants assert that the Secretary's implementation of the statute is unfairly (and unconstitutionally) racially discriminatory because it disproportionately burdens Puerto Rico hospitals, residents of Puerto Rico, and staff at appellants' hospitals, most of whom are of Hispanic descent.

Congress was not unaware of the diminished DSH payments made to Puerto Rico hospitals. Indeed, over the years several bills have been introduced to address that disparity. For example, in 2004, a bill was introduced in the Senate which would have amended the Puerto Rico IPPS Statute in precisely the manner suggested by appellants, by substituting receipt of benefits under Puerto Rico's cash assistance program for the aged, blind, and disabled for receipt of SSI benefits as the proxy for low-income patients. See Medicare DSH Payments for Puerto Rico Hospitals Fairness Act of 2004, S.2260, 108th Cong. (2004); see also Puerto Rico Hospitals Medicare DSH Equity Act of 2005, H.R. 4207, 109th Cong. (2005); Puerto Rico Hospitals Medicare DSH Equity Act of 2007, H.R. 616, 110th Cong. (2007); Puerto Rico Hospitals Medicare

_____

and disabled. Residents of Puerto Rico, however, are not eligible for SSI benefits. Instead, they continue to be eligible for the cash assistance programs that preceded SSI. But, say appellants, anyone eligible for Puerto Rico's cash assistance program would also qualify for SSI benefits if they lived in one of the fifty states. Thus, appellants argue that when dealing with residents of Puerto Rico, the receipt of cash assistance under Titles I, X, XIV, and XVI of the Social Security Act is a more appropriate and equitable proxy for low-income patients treated than is receipt of SSI benefits.

DSH Equity Act of 2009, H.R. 1502, 111th Cong. (2009). None of those bills was enacted into law.

## II.

We review a district court's grant of summary judgment de novo. Irish v. Fowler, 979 F.3d 65, 73 (1st Cir. 2020). In doing so, we read the facts in the light most favorable to the non-prevailing party (here, the hospitals), granting all reasonable inferences in their favor. Id.

## A.

We think the statutory language at issue is neither ambiguous nor open to plausible differing interpretations. When establishing the DSH payment program, Congress devised a plain and understandable (if complex) formula that employs receipt of SSI benefits as one factor to approximate the unreimbursed costs incurred by hospitals in treating low-income patients. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). When Congress subsequently admitted Puerto Rico hospitals into that program, it made clear that the existing "provisions" (including their use of the "Medicare/SSI fraction") "shall apply" to Puerto Rico hospitals "in the same manner and to the extent" they apply to similarly-situated hospitals in the states. Id. § 1395ww(d)(9)(D). The parties do not dispute the plain meaning of the statute's terms "manner" (which appellants define as "process" or "a characteristic or customary mode of acting"), or "extent" (which appellants define

- 11 -

as "the range over which something extends"). Appellants' Brief at 37 n.4, 38 n.5. Instead, their dispute centers on the appellants' contention that the "natural reading" of the statutory provision as a whole "is that DSH payments for Puerto Rico hospitals should be calculated using the same process that is used to calculate DSH payments for hospitals in the States" and that "DSH payments should be as available to Puerto Rico hospitals as they are to hospitals in the States." Appellants' Brief at 37-38 (emphasis supplied). Appellants further contend that the Secretary has violated this putative statutory command insofar as "the Secretary excludes all low-income Puerto Rico resident Medicare beneficiaries [from counting under the SSI fraction] but does not exclude all low-income Medicare beneficiaries from any State [from so counting]," as this, appellants claim, signifies that "DSH payments are not available to Puerto Rico hospitals 'to the extent' as hospitals in the States." Id. at 38 (emphasis supplied).

But, as the Secretary points out, Appellee's Brief at 20, the statute directs that specified "provisions . . . relating to disproportionate share payments," 42 U.S.C. § 1395ww(d)(9)(D) (emphasis supplied), "shall apply" to Puerto Rico hospitals "in the same manner and to the extent as they apply" to other U.S. hospitals, id., and not that "DSH payments" should be so "appl[ied]." Thus, we agree with the Secretary that it is the

appellants' reading which conflicts with the plain text of the statute, because, among other difficulties, adopting it would require us to replace the word that Congress actually employed - "provisions" - with appellants' preferred terminology. See, e.g., United States v. Flores, 968 F.2d 1366, 1371 (1st Cir. 1992) ("Courts should not lightly read . . . clauses out of statutes, but should, to the exact contrary, attempt to give meaning to each word and phrase."). The Secretary's regulatory implementation of those statutory provisions was entirely consistent with Congress's mandate.

But, say appellants, the Secretary's use of the "Medicare/SSI fraction" and its "SSI benefits proxy" undermines the purpose of the DSH payment program, and is plainly inconsistent with congressional intent. Those factors, they argue, compelled the Secretary to enact regulations that employ a different, more appropriate proxy or metric - one that took into account the reality that SSI benefits are not paid to residents of Puerto Rico.

While we understand the hospitals' perspective, and appreciate the economic disadvantages they describe, their claim to legal relief necessarily falls short. First, Congress was aware that its use of this "proxy" in the statutory DSH formula was just that. See H.R. Rep. No. 99-241, at 17 (1985) (Conf. Rep.) (explaining that Congress was using in the DSH formula "a proxy measure for low income" - substantially because "[t]he Committee

- 13 -

did not want to impose any additional administrative requirements on hospitals or patients" - and it was aware that its "proxy measure of low-income status might substantially understate the presence of low-income patients in some hospitals").

Moreover, Congress spoke in unambiguous terms and the Secretary (and this court) must give effect to its clear instructions. See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984); see also Maine Med. Ctr. v. Burwell, 841 F.3d 10, 21-22 (1st Cir. 2016) (discussing the Chevron analysis in the context of reviewing the Secretary's interpretation of DSH payment calculations similar to those at issue in this case). Critically, Congress did not vest the Secretary with authority to employ other, likely more accurate or equitable, proxies when calculating DSH payments to Puerto Rico hospitals. Indeed, Congress explicitly required the Secretary to apply precisely the same specified provisions it had established for calculating DSH payments to hospitals in the states.

The Secretary's implementation of the Puerto Rico IPPS Statute does not run afoul of the Act itself, and the implementing regulations were not enacted in violation of the Administrative Procedure Act. Even if the Secretary had been convinced that a different proxy would have been more suitable, more equitable, or even more effective in carrying out Congress's overall purposes

than the language Congress actually enacted, the Secretary was powerless to substitute his judgment or language for that of the Congress. That is true even if straying from the clear statutory language might be thought to be better policy or might actually better serve the underlying purpose of the DSH payment program. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 188, 114 S. Ct. 1439, 1453-54, 128 L. Ed. 2d 119 (1994). If Congress mistakenly imposed requirements that resulted in unintended lower payments to hospitals in Puerto Rico, Congress could, of course, have remedied that mistake. The Secretary, however, could not. See Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 325-26, 134 S. Ct. 2427, 2445, 189 L. Ed. 2d 372 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms. Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always give effect to the unambiguously expressed intent of Congress." quotation omitted); Chevron, 467 U.S. at 842-43, 104 S. Ct. 2778, 2781 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Cf. Mistretta v. United States, 488 U.S. 361, 372-73, 109 S. Ct. 647, 654-55, 102 L. Ed. 2d 714 (1989) (discussing the circumstances under which

Congress can delegate rule-making authority to an executive agency).

**B.**

Appellants' Equal Protection arguments fare no better. The hospitals assert that the Secretary's "interpretation" of 42 U.S.C. §§ 1395ww(d)(5) and (9) amounts to arbitrary, irrational, and impermissible racial discrimination targeting the hospitals and their predominantly Puerto Rican patients. Appellants' Brief at 49. But, appellants' real difficulty is not with the Secretary's exercise of discretion in his implementation of the statute, but rather with the unambiguous statutory provisions themselves (as noted earlier, appellants do not challenge the statutory provisions as being violative of the Equal Protection Clause).

Moreover, nothing in the record suggests that either the statutory or regulatory scheme at issue was the product of any racially discriminatory intent or purpose. See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S. Ct. 555, 563, 50 L. Ed. 2d 450 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection

Clause."); <u>Washington</u> v. <u>Davis</u>, 426 U.S. 229, 240, 96 S. Ct. 2040, 2048, 48 L. Ed. 2d 597 (1976) ("[T]he basic equal protection principle [is] that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.").

## III.

In an effort to more fully and faithfully implement what they see as congressional intent behind certain aspects of 42 U.S.C. § 1395ww(d), appellants essentially ask this court to ignore the unambiguous language used in the statute. In their view, the Puerto Rico IPPS Statute requires "DSH <u>payments</u> to be made to Puerto Rico hospitals in the same manner and <u>to the extent</u> that those <u>payments</u> are made to hospitals in the States." Appellants' Brief at 15 (emphasis supplied). But, that is not what the statute says. Rather, it requires the Secretary to apply the "<u>provisions</u>" of the statute to "Puerto Rico hospitals receiving payment under this paragraph in the same manner and to the extent as they apply to" hospitals in the states. That is precisely what the Secretary has done for roughly 30 years, without congressional correction. Uniformly applying those statutory provisions, as directed, may well have worked to the financial disadvantage of hospitals in Puerto Rico. But the remedy for such a disadvantage lies with Congress. The Secretary, however, remained obligated to implement the law as Congress directed.

- 17 -

For the foregoing reasons, the district court's decision is necessarily _affirmed_.